IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Sa'Quena Llamas,

        Plaintiff,

        vs.                      Case No. 13-2053-JTM

QC Financial Services, Inc.
    d/b/a Quik Cash,

        Defendants.


MEMORANDUM AND ORDER

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The court excludes from these findings those assertions of the parties which are not tied to any evidentiary support, or which are grounded on speculation or hearsay.

The court notes that, in addition to its motion for summary judgment, QC also moves to strike large portions of Llamas's affidavit, largely on the grounds that it directly contradicts her earlier deposition testimony.[1]

In "unusual" cases, affidavit testimony may be disregarded if, rather than resolving ambiguity or explaining confusion in earlier deposition testimony, it is offered in direct

---

[1] The Motion to Strike also complains that various portions of Llamas's affidavit are conclusory and self-serving, relying on *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). In *Hall*, the court observed that affidavits in opposition to summary judgment "must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient." QC repeatedly cites only the last clause from this passage, not the first. The passage itself rests on *Palucki v. Sears, Roebuck*, 879 F.2d 1568, 1572 (7th Cir. 1989), where the court held that an affidavit from a "plainly disgruntled" former employee stating he had a "gut feeling" the employer acted with discriminatory intent had "too little evidentiary value to create, all by itself, a genuine issue of material fact." Both *Hall* and *Palucki* were essentially concerned with an affiant's personal knowledge. As the Tenth Circuit has subsequently stressed, "[s]o long as an affidavit is based upon personal knowledge and set[s] forth facts that would be admissible in evidence, it is legally competent to oppose summary judgment, irrespective of its self-serving nature." *Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n. 4 (10th Cir. 2012) (internal quotation omitted). Thus, for example, while Llamas's denial of using profanity during the audit may indeed be "self-serving," it is based on personal knowledge and is therefore competent.

contradiction to such testimony. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). In resolving such an issue, the court looks to whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir.2001) (quotation omitted).

The court denies the Motion to Strike. First, such motions are not appropriately advanced in the context of summary judgment motions and their supporting pleadings. *See In re Cessna 208 Series Aircraft Products Liability Litig'n*, 2007 WL 2253479 (D. Kan. 2007). This court has specifically indicated that a motion to strike

> is not the proper method to address [problematic] testimony. The proper method is to dispute the facts relied on in the deposition testimony as not supported by admissible evidence. It suffices that the party objecting to summary judgment material simply state the objection with a brief description (akin to a speaking objection) and citation to the Federal Rule or case upon which the objection is based, in response to the factual averment itself.

*Green v. Harbor Freight Tools USA*, 2013 WL 4504316, *3 (D. Kan. 2013).

Further, in many instances the affidavit does not *directly* contradict earlier deposition testimony. Thus, the defendant complains that in Paragraph 3 of her affidavit, Llamas states, "I was never counseled or disciplined regarding the manner in which I conducted myself with co-workers or customers," while citing earlier deposition testimony in which she indicated indeed that she had been "counseled." A review the actual testimony, however, indicates that Llamas answered affirmatively when asked, "So, she counseled you previously for this very thing, didn't she?" But the "very thing" referenced in the question was apparently for a shortage in the store — not counseling as to Llamas's relations with customers or co-workers.

On the other hand, at Paragraph 8 of her affidavit, Llamas unequivocally states that Robinson did not talk to her about any overages or shortages before the August 10, 2009 write up, and "I did not know they were issues until they were included on the August 10 write up." Yet Llamas had previously testified:

Q. And, it's not incorrect that this is a repeated violation, is it?

A. No.

Q. In other words, she had counseled you previously on this [the overages and shortages], hadn't she?

A. Just said – made a comment like, you know, you need to pay attention.

Q. Well, if someone makes a comment about you not performing exactly the way they want them to and they're your superior, do you consider that to be counseling or not?

A. Yes. Yes.

Q. So, she counseled you previously for this very thing, didn't she?

A. Yes.

Llamas's subsequent averment thus directly contradicts what she earlier acknowledged, that Robinson had indeed alerted her to the issue of overages and shortages prior to the August write up.

Similarly, in Paragraph 10 of her affidavit, Llamas denies having "a meeting with Deanna Robinson and Bill Banker on January, 4, 2001," after an argument with Robinson on January 4, 2011. Rather, she telephoned Banker after the argument, and later apologized to Robinson. She continued, stating that neither Robinson or Banker told her she should improve her performance on January 4, 2011. (Aff. ¶ 13).

In her deposition, Llamas testified

Q. Well, earlier in your deposition we spent some time, a little bit of time, talking about how you were counseled and talked to by Bill Banker and Deanna Robinson about punctuality and about professionalism and teamwork, do you remember testifying to that?

A. Yes.

Q.  And, those were not at the end of your pregnancy, were they ma'am?

A.  No, that's when me and Deanna got into an argument.

Q.  And, my question is: That's not at the end of your pregnancy, was it?

A.  No.

In responding to the motion to strike, plaintiff argues that the affidavit is not really contradictory, since the deposition "does not contain any temporal reference" to January 4, 2011. This is disingenuous. Only one "argument" is referenced during the relevant time period, and Llamas's own affidavit acknowledges that "[a]t no point on January 4" was she told she needed to "change or improve my performance," nor did they "comment on tardiness." This directly contradicts her deposition testimony that, on the same day as she argued with Robinson, both Banker and Robinson "counseled" her about "punctuality and about professionalism and teamwork."

In no instance, however, do such contradictions affect the court's ultimate conclusion. In most cases where there does appear to be a direct and unexplained contradiction of earlier testimony, the apparently conflicting portions of the plaintiff's affidavit are not even cited in the text of her Response Brief. In other instances, apparent conflicts, such as whether Llamas did in fact call Banker to complain about her raise on May 18 (Aff. ¶ 134) relate to issues surrounding the 2011 performance review, which (as discussed below) plaintiff effectively concedes by failing to respond to QC's legal arguments. Similarly, the ultimate truth of the assertion (in Llamas's affidavit) that she did not use profanity in front of co-workers or customers is not controlling, since the ultimate issue is whether or not Banker and QC had a good faith basis for believing that she did, and that evidence establishes they did.

### Findings of Fact

QC is a provider of convenient financial solutions that meet the immediate needs

of mainstream Americans. The company believes business success stems from how its customers are treated, and expects its employees to deliver exceptional, personalized customer service, starting with the customer's initial contact with QC.

According to its employee manual, QC is committed to the principle of equal employment opportunity and nondiscrimination. QC has a policy against discrimination and harassment, and it is committed to providing a work environment that is free of unlawful discrimination and harassment. Under that policy, employees must immediately report any discrimination or harassment to their area manager, regional manager, or the human resources department.

The manual provides:

> The employee manual contains many important policies that if violated, may result in disciplinary action up to and including termination. The company recognizes that each situation involves a unique set of circumstances and progressive discipline is promoted. Each situation should be reviewed and evaluated on the individual facts and in the context of surrounding circumstances such as severity of the situation, number of occurrences, tenure with the Company, prior disciplinary action, etc.

The manual provides a progressive system of discipline, based on the severity of the infraction.

QC has an open door policy, and if an employee has a concern, he or she can go to his or her supervisor or directly contact Human Resources.

QC also has an absenteeism policy, where unexcused or excessive tardiness and absenteeism are grounds for discipline, up to and including termination. Disciplinary actions can range from verbal documentation to termination, and the type of discipline given to an employee depends on, among other things, the severity of the offense, prior disciplinary action, and the number of violations.

QC's disciplinary procedures provide that an employee may be immediately terminated for insubordination, "including refusing a reasonable request and using obscene or otherwise objectionable language," or for "[l]ack of respect for and cooperation

with co-workers, including the use of profane or abusive language" may result in immediate termination.

QC managers conducts annual performance assessments. Banker typically talks with his area managers about the assessments of branch managers, and usually is shown the performance assessments of the branch managers.

Llamas, who identifies herself as multiracial – Caucasian, African-American, and Native American – applied for employment with QC on April 21, 2009. In her application, she certified that the information she supplied was true, accurate, and complete, and agreed that any misrepresentation or omission of fact would be cause for denial of employment or immediate termination of employment, regardless of when or how discovered.

In her deposition, Llamas admitted that she failed to include all of the requested information on her application to QC. Although the application asked her to list her last four employers, Llamas listed only three. She also did not answer the question asking how many jobs she had held over the last ten years. She also did not indicate that she had worked for at least eight other employers.

Although the application asked her to describe the instances where she had been discharged or asked to resign, Llamas did not report that she had been fired from at least five other jobs.

Llamas also admitted she was not always truthful on her application. She listed Comfort Keepers as one of her previous employers, but she failed to state the true reason why she left her employment with Comfort Keepers. Llamas was fired from that job the same day she started it, after telling her supervisor "you're full of shit."

On May 26, 2009, QC area manager Deanna Robinson hired Llamas as a customer service representative. Robinson had begun working for QC in 2005 as a branch manager. Promoted to area manager in 2006, Robinson oversees the daily operations of four

branches. Robinson identifies herself as a Caucasian female. She has one child, who is biracial.

When she was hired, Llamas received a copy of QC's employee manual. That manual discusses QC's policies and procedures and sets forth QC's expectations of employees.

Robinson reports to regional manager William Banker. Banker, a white male, has worked for QC for seventeen years. He has been a regional manager since 2001 or 2002. As regional manager, Banker works with area managers to run the stores in his area, and relies heavily on his five area managers and talks with them on a daily or weekly basis.

Banker approved the hiring of Llamas. When Robinson took over Branch 523 as area manager, she hired three customer service representatives – Llamas, Kayla Newman (who is Caucasian), and Guadalupe Luna (who is multiracial).

During her entire tenure with QC, Llamas worked at Store 523.

When Robinson disciplines an employee, she generally communicates and consults with Banker. In disciplining an employee, Banker will generally speak to the employee involved or other employees who have witnessed misconduct, and may issue a verbal warning accompanied by some written memorial. However, Banker also testified that each disciplinary situation is different.

On August 10, 2009, Robinson wrote up Llamas and Newman for overages and shortages in their cash drawers. Robinson had verbally counseled Llamas on each of the occasions her cash drawer had overages or shortages.

On August 26, 2009, Robinson promoted Llamas to the position of assistant branch manager. Banker approved the promotion. As a result, Llamas's salary increased from $9.00 to $10.25 per hour.

Llamas found out she was pregnant on or about October 7, 2009. She told Robinson the same day.

The very next day, Robinson promoted Llamas to branch manager. Robinson knew Llamas was pregnant when she decided to promote Llamas. Banker approved the promotion. Llamas's salary increased to $12.00 per hour. Llamas was promoted after Robinson had terminated the previous manager, Kim McFadden (a Caucasian).

As branch manager, Llamas was the face of the store and the highest-ranking official at the store, and her responsibilities included the management of employees, opening the store on time, counting the money in the safe, and general responsibility for the store.

Robinson gave Plaintiff "whatever time she needed" with regard to her pregnancy in 2009, which resulted in a miscarriage.

Llamas has admitted that although she missed work due to complications with her pregnancy in 2009, she was never demoted and did not lose any salary or benefits. Indeed, she received a raise in April, 2010, from $12.00 to $12.50 per hour.

This raise was based upon her performance appraisal the month before. The rating given in that appraisal – meets and sometimes exceeds relevant performance standards – was consistent with what Robinson had seen of Llamas's job performance.

However, between March 2010 and December 2010, Robinson talked with Llamas about her tardiness, bringing personal issues into work, and the manner in which she conducted herself in front of co-workers and customers. Robinson and Banker spoke with her about maintaining a professional work environment, being punctual, and being professional. Llamas also acknowledged in her deposition that Robinson counseled her about her drawer being under and over, and warned her about being late to work. Robinson informally spoke with Llamas about these issues, and did not document them.

Robinson has testified that these discussions occurred on an almost weekly basis between March 2010 and December 2010. Llamas attempts to controvert this fact by stressing that Robinson did not explicitly characterize her comments as disciplinary in

nature, but Llamas otherwise admits that Robinson had to discuss "issues" about her job performance.

Robinson has testified that, sometime between March and December 2010, Robinson witnessed Llamas call a customer's child an "Indian giver." Llamas denies doing so. However, it is uncontroverted that, believing such comments are unprofessional, Robinson verbally warned Llamas over the incident.

During this same time, Llamas told her subordinates that she had purchased food stamps from someone's EBT card at a cheaper rate than the rate on the card. She was also tardy on several occasions. It is uncontroverted that Robinson had to verbally counsel Llamas on several occasions about her tardiness.

According to Robinson, Llamas would talk about her personal business, such as problems she was having with her husband and kids, while at the store. Again, Robinson verbally counseled Llamas about failing to maintain a professional environment.

Robinson became concerned about Llamas's failure to act professionally in the store. She spoke with Banker on several occasions about Llamas's job performance. On January 4, 2011, Robinson and Banker (participating by telephone) counseled Llamas about job performance issues. The purpose of the meeting was to discuss issues that had been previously addressed about Llamas's job performance but not resolved, including tardiness, lack of professionalism, and bringing personal issues into the workplace were discussed.

Banker reiterated to Llamas that the issues they were addressing with her had been previously discussed, and they were at a point in time where she needed to change and improve her behavior. Banker told Llamas it was her responsibility to lead and manage the branch and the employees, and she needed to follow through with her responsibilities. This meeting was disciplinary in nature, in that Llamas was verbally counseled and given an additional opportunity to make the necessary corrections to her job performance.

Later that same day, Llamas sent Robinson a message on Facebook saying she was "really excited to get off to a great new start!" Robinson responded by saying, "Me too! We're going to have [a] great year!"

According to Robinson, between January 4, 2011, and February 14, 2011, there were still issues with Llamas's job performance. Robinson testified that Llamas continued to have issues with tardiness, and on at least one occasion, Llamas sent a text to Robinson saying that she would not be at work, and when Robinson responded to Llamas, Llamas did not reply.

Robinson talked with Banker about concerns she had with Llamas's performance, particularly her lack of professionalism.

Very early on in Llamas's pregnancy that resulted in the birth of her child in 2011, Llamas told Robinson that she was pregnant. On February 8, 2011, Llamas notified QC of her need to take medical leave beginning March 1, 2011, for the birth of her child.

Robinson helped Llamas in getting FMLA leave, including voluntarily taking the FMLA paperwork to Llamas's house, waiting for Llamas to fill it out, and sending it in. No one asked Robinson to do this, she volunteered in order to help Llamas. Llamas sought leave until April 12, 2011.

On or about February 15, 2011, Llamas received a letter from Melissa Hendrix, then-Human Resources Generalist, congratulating Llamas on the "happy news" of her pregnancy and providing information regarding FMLA leave.

On or about February 17, 2011, Llamas signed a leave of absence request, which was also signed and submitted by Robinson. Llamas's request for leave was approved on February 23, 2011.

On February 28, 2011, Robinson posted a message on Llamas's Facebook page stating:

> It's almost time!! You made it. How exciting! In a matter of hours God will bless you and your family by meeting your beautiful baby girl!! I hope and pray that your surgery goes great and you have a speedy recovery so you can

spoil her. If there is anything I can do please let me know.

Llamas returned to work on April 12, 2011, with no medical restrictions.

Llamas has admitted that she failed to open her store on time on April 14, 2011. She also admitted it is essential to open her store on time because, among other things, customers expect the store to be open, and it is more secure to open the store on time so employees can walk into the store together. She did not arrive at her store until almost 10 a.m. on April 14.

On or about April 20, 2011, Llamas received a counseling form for her failure to open her store on time. Before giving her the counseling form, Robinson had verbally discussed Llamas's failure to open her store on time.

Llamas admitted the April 2011 counseling form was not the first time that Robinson had talked with her about failing to be at work on time.

Robinson told Llamas that she needed to arrive to work on time, and the next occurrence would lead to disciplinary action, up to and including termination. Llamas understood that if she arrived to work late again, QC could terminate her employment.

There were no changes to Llamas's wages or responsibilities as a result of the counseling form she received on April 20, 2011.

Llamas did not write any comments on the "employee comments" section of the counseling form. No one told Llamas that she could not write any comments on the counseling form

Four days after Llamas was late to work, on April 18, 2011, Llamas wrote up Brenda Prevost, one of her subordinates, for Prevost's cash drawer being short on April 14, 2011, and April 18, 2011.

Llamas has admitted she and Robinson had conflicts. She told Robinson about Prevost's cash shortages, and Robinson signed the counseling form. Robinson never told

Llamas not to counsel Prevost, never indicated she was wrong to counsel Prevost, and never said she was disappointed in Llamas for counseling Prevost.

Llamas received a new professional assessment on April 22, 2011. spoke with Banker about the assessment, including Llamas's overall performance and her lack of professionalism. Robinson met with Llamas in person and discussed the performance assessment. The assessment gives an overall rating of "sometimes falls short of expected job performance and goals." Robinson also noted that, prior to Llamas's maternity leave, "overall performance has lacked compared to last year's performance review."

According to Robinson, the performance issues addressed in the 2011 performance assessment were not at issue on Llamas's previous performance assessment. According to Robinson, prior to going on leave, Llamas's "overall performance lacked compared to last year's performance review." Although Llamas was given an additional opportunity from January 4, 2011, and going forward to correct her job performance, Robinson found that, by the time of the performance assessment, "things really hadn't changed."

Llamas has admitted it was her responsibility to develop and maintain a professional, team-oriented work environment, and she needed to develop and maintain such an environment. Llamas also admitted that, prior to April 2011, Robinson and Banker had spoken with her about maintaining a team environment.

Llamas's performance assessment also stated that the assistant manager was not knowledgeable enough to run the branch in Llamas's absence. Llamas admitted it is the branch manager's responsibility to train employees. She also agreed that, as her performance assessment stated, it was her responsibility to reiterate to all employees the importance of arriving at work on time and being ready to work at the scheduled time.

Llamas admitted that Robinson had spoken with her about her employees being late. The performance assessment stated that if the key holder is late, it is a poor refection on the business, inconvenience to customers, loss of revenue, coworkers have to wait and

lose work time, and it poses a security risk for employees to wait in the parking lot. Llamas admitted that if the store is not open on time, it is difficult to be profitable. Llamas admitted she was written up for being late.

Llamas knew she had to maintain an acceptable level of performance, or disciplinary action, up to and including termination, would occur. She also knew she needed to perform at a high level to keep her job. She also knew that she could offer written comments in response to her performance assessments. She never chose to do so.

Robinson has testified that, when she discussed the performance assessment with Llamas, Llamas did not have any comments, and Robinson believed that Llamas was "fine" with the assessment and did not seem upset. Llamas in her response to the motion for summary judgment, asserts that she told Robinson she believed the negative assessment was due to her pregnancy. As explained below, this factual dispute is not decisive as to the issues before the court.

It is uncontroverted that, after Robinson gave Llamas the assessment, Llamas gave Robinson a ride to pick up Robinson's car.

Llamas testified in her deposition that she now believes she should have received a rating of "consistently achieves expected job performance and goals." At the same time, she admitted she did not always perform her job in the manner that Robinson wanted her to perform, and she sometimes fell short of what QC or Robinson expected from her.

In April 2011, Robinson gave Llamas a raise from $12.50 to $12.75 per hour. Banker approved this raise

Llamas called Banker, upset that she did not get the full amount of the merit increase available in 2011. Banker told Llamas that she did not receive the full merit increase available because she had performance issues, and therefore, was not eligible for the full merit increase available. Llamas admitted in her deposition that during this call she did not complain to Banker about her performance assessment.

On May 13, 2011, Llamas and the assistant manager, Julie Klass (who is white), left the store without permission to attend a yard sale. On the way back from the yard sale, Llamas rescued a dog and brought it to the store. Llamas admitted that she brought a stray dog to the branch, that she knew it was against the rules, but Robinson did not write her up for that.

During April and May 2011, Prevost, Llamas's subordinate, expressed concerns about Llamas's conduct and behavior towards Prevost. Robinson told both Prevost and Llamas to document any concerns or issues between them. Robinson never received any documentation from Llamas.

Prevost sent her an email with the subject of "saquena & store 023," providing a list of "things that was said and done since the 12th of April." She wrote that Llamas told her that Llamas was not going to hire Prevost; Llamas and the assistant manager would go into the bathroom and laugh but when Prevost walked in there, they would stop laughing; Prevost would be working at the front while Llamas and the assistant manager did scratch offs in the back; Prevost would arrive on time for work but would have to wait for Llamas to arrive to begin working; and Llamas would tell Prevost that if the store did well, it was Robinson's store, and if the store did poorly, it was Llamas's store.

Llamas has admitted that Prevost's email indicated she did not look to Llamas as a leader, she felt disrespected, and she did not feel she was working in a professional environment. She admitted that going to the bathroom and laughing, and then cease laughing when someone comes in the bathroom is not respectful and is not the type of conduct that QC expects from its managers.

The complaints contained in Prevost's email were the same complaints that Prevost made to Robinson during the latter half of April and most of May 2011.

Since August 2009, QC has employed Mary Youngblood as a corporate internal auditor. While at QC, Youngblood has conducted hundreds of audits.

During these audits, Youngblood visits a branch store and, among other things, counts and verifies the cash, runs various reports, reviews the collateral and customer files, looks at transaction logs, examines transaction reports, and reviews suspicious activity reports to ensure the store is in compliance with state law and regulations. Stores are not notified when there is an audit; rather, the auditor simply shows up at the store on the day of the audit, and tells the employees that he or she is there for an audit. The audit is an interactive process in that the auditor shows any errors to the branch manager, and makes copies of the documents containing the errors – one set for the auditor, and one set for the branch manager.

On May 17, 2011, Youngblood conducted an audit of Llamas's branch, Store 523. Youngblood had not met Llamas before, and Llamas was present for the audit. The audit covered the time from January, 2010 to date of the audit. Llamas was the branch manager during that entire time.

Llamas was also the branch manager in January 28, 2010, when the store was previously audited and received an audit score of 87.27.

Throughout the audit, Youngblood spoke with Llamas, and when she found an error, she told Llamas. When Youngblood showed Llamas errors, Llamas asked who made the error.

According to Youngblood, if the error was made by the assistant manager, Llamas would say something along the lines of "oh, well, you were busy that day." If the error was made by the customer service representative, Llamas "would berate her, yell at her saying I can't believe you made this mistake." Youngblood testified that, on several occasions during the audit, Llamas told Prevost that she would not have hired her.

Llamas has admitted she may have told Prevost to pay more attention when a mistake was pointed out to her during the audit. She also admitted that telling an

employee you would not have hired her is disrespectful and is not what QC expects from its managers. She admitted that demeaning subordinates violates QC's policies.

While she was conducting her audit, Youngblood spent about half her time in a location where she could see the customers and employees interacting. Youngblood saw that Llamas cursed "fairly often." She did not specifically recall which curse words Llamas used, but that she likely used the words "damn" and "shit" and possibly "ass" or "asshole." Llamas has admitted she probably used profanity during the audit. She testified in her deposition that she is no stranger to profanity.

Indeed, according to Youngblood, there was one instance during the audit when Llamas got off the phone with a customer, and talked about that customer, using several curse words, in front of another customer. Youngblood testified Llamas should not have talked about a customer's debt in front of another customer, and should not have cursed and complained about one customer in front of another customer.

In her response, Llamas argues that Youngblood and her employees were not offended by her profanity. She avers that she did not use "foul language" during the audit. It is unclear how Llamas would actually know the subjective reaction of Youngblood and the branch employees. The court assumes for purposes of the present motion that they did not take offense.

Nevertheless, it remains uncontroverted that such language violates QC policies. Further, it is uncontroverted that, given Youngblood's report, QC had clear grounds for finding Llamas was violating company policies. Llamas has admitted that cursing in front of a customer is not the type of customer service contemplated by QC and is not consistent with QC's values.

Llamas has admitted she has a history of using profanity, ranging from using profanity at school to using profanity during her employment with other companies to

using profanity on her Facebook page. In fact, Llamas had cursed out one of her previous employers and was discharged as a result.

Youngblood's audit lasted from 9 a.m. until about 5:40 p.m. At the conclusion of her audit, Youngblood prepared a preliminary report and gave a copy of the report to Llamas, along with copies of all the errors Youngblood found during the audit. According to Youngblood, when she gave Llamas the report, Llamas "seemed very angry" and upset.

The audit score was 70.80, which Llamas has acknowledged is not a very good score, and that you are supposed to score as close to 100 for an audit score.

During the audit, Llamas never said or intimated to Youngblood that Robinson treated her differently because of her race, gender, pregnancy, or taking FMLA leave.

The day after the audit, Youngblood called the QC human resources to report what she seen. In the hundreds of audits she has conducted, Youngblood has never had to contact human resources after an audit.

Also on the day after the audit, Llamas sent an email to Robinson stating that she "was just thinking that I should of [sic] made a comment" about the performance assessment she had received the previous month. She wrote that her review "was based off the last couple months" of her pregnancy and not the year as a whole. She also wrote that she had contacted human resources, and they told her that she could "write something down to say that was how I felt about the review."

The same day, Llamas called Robinson and asked why she received a two percent raise in April 2011, instead of a three percent raise. Llamas testified during her deposition that she received a raise every time she was eligible for a raise, and QC never held back any money from her in terms of raises.

The following day, May 19, 2011, Llamas opened up Store 523 wearing, as she testified in her deposition, either "nightwear" or "sleepwear." Again, this was a violation of QC's policies.

On May 23, 2011, Youngblood met with Annette Glary, then-director of Human Resources, and told Glary everything she had witnessed at the branch, and Glary told Banker the following day that Youngblood reported "highly unprofessional behavior" by Llamas.

Banker then spoke with Youngblood. The auditor said that Llamas's behavior was "abhorrent," and she was "unprofessional, rude, disrespectful," used "foul language" in front of employees and customers, told Prevost she would not have hired her, and was disrespectful to Prevost. Youngblood has testified that , when she told Banker about what happened during the audit, Banker seemed disappointed and upset, and seemed like he "really liked" Llamas. During his seventeen years with QC, Banker never had an auditor report behavior during an audit to human resources.

Banker called Robinson and told her to set up a meeting with Llamas for the following day to counsel and write her up. Banker also told Robinson about the audit findings, Llamas's behavior during the audit, and asked Robinson to contact Youngblood to get the details. Youngblood told Robinson that Llamas cussed in front of customers and coworkers, and made derogatory remarks about Robinson and Prevost.

During her seven years as an area manager, Robinson never had an auditor report behavior during an audit to human resources. Youngblood testified that when she told Robinson what happened during the audit, Robinson seemed surprised and kept apologizing to Youngblood for having to go through it.

Llamas and Robinson talked by telephone at least twice on May 24, 2011. According to Robinson, during these phone calls, Llamas never complained about pregnancy discrimination.

During their first call, Robinson told Llamas that Robinson and Banker wanted to meet with Llamas. Llamas has admitted that during this conversation, she became angry and upset with Robinson.

Shortly after this conversation, Llamas called Robinson back. According to Robinson, Llamas told Robinson that if Robinson and Banker were going to fire her, she wanted to know so she "wouldn't have to come in here and bust her ass." Llamas denies making this comment. Llamas told Robinson that she wanted to add a comment to her performance assessment.

The same day, May 24, 2011, Llamas faxed a comment to Robinson about the performance assessment which she had signed without comment on April 22, 2011.

Robinson did not agree with Llamas's comment and testified that if Llamas had an issue with her performance assessment, she should have addressed it at the time she received her performance assessment. At no time between the assessment and May 24, 2011, did Llamas complain or make a comment about her assessment.

Llamas admitted in her deposition that she waited about a month to make any comment about her performance assessment, and that the most significant event that occurred after she received her assessment was the May 17 audit, and learning that Banker wanted to meet with her promptly.

In this fax, Llamas stated she did "not feel that my review was based on the year as a whole," and that "I feel that toward the end of my pregnancy I did not do my best due to how I felt." At the same time, Llamas has also admitted she was not under any medical restrictions. Her fax also stated, "I do not believe that being pregnant is an excuse not to perform to [sic] the duties of my job title."

Robinson called Banker and told him that during their conversations, Llamas was rude, unprofessional, insubordinate, and disrespectful. It is uncontroverted that Robinson told Banker that Llamas said that if QC was going to fire her, to go ahead and fire her because she did not want to work her "ass" off for QC any longer.

It is uncontroverted that, after weighing what happened days earlier with the auditor and the behavior that Llamas exhibited toward Robinson, Banker determined that

Llamas was demonstrating very consistent behavior in front of the auditor, toward an employee, in front of a customer, and now, directed toward her immediate supervisor, and therefore, decided to terminate Llamas's employment.

Banker alone made the decision to terminate Llamas. Robinson did not recommend or suggest to Banker that Llamas's employment be terminated.

Llamas was discharged on May 25, 2011, for improper conduct, unprofessional behavior during the audit that was performed on May 17, 2011, making derogatory remarks, being disrespectful toward a subordinate, failing to maintain a professional work environment, cursing in front of customers, being insubordinate, and continued poor performance.

In the present action, Llamas alleges that she was subjected to disparate treatment due to race, in violation of Section 1981 and Title VII, wrongful discharge due to sex/pregnancy in violation of Title VII, retaliation in violation of Title VII, and FMLA retaliation.

Llamas has testified that she discussed all the reasons and grounds for her lawsuit during the deposition.

She believes she was discriminated against on the basis of her race, and testified she is accusing Robinson of discrimination. Still, she admitted she listed Robinson as a reference on her application for employment with KNI. Asked why she believed race had something to do with her termination, Llamas testified that a pregnant female in Junction City was allowed to come back to work, which, she claimed, was no different than her situation. She also testified that an African-American pregnant female was let go, and was replaced by a Caucasian female, but she admitted her information regarding the individual was secondhand and she knew nothing about that employee's work performance.

In interrogatories propounded to Llamas, she was asked to discuss and describe the facts that supported her race discrimination claim, and Llamas's answer simply referred

to her answer to Interrogatory 15. In Interrogatory 15, Llamas was asked to identify individuals outside her protected class who engaged in the same or similar conduct but were treated more favorably, and Llamas stated:

> Debbie Horn, hired to replace Val Haggerty in the same position as Llamas but was paid more per hour than Llamas. Debbie Horn is white and not pregnant. Rick, the employee hired to replace Llamas was offered a salary position. Sara in the Junction City store had a baby, quit, and was hired back on. Amy Beyers, Deanna's friend, in the Junction City store was paid more than any manager in Deanna's area.

QC did employee a Debra Hearne, who identifies herself as Caucasian, as a branch manager in October 2010. In October 2010, Hearne was paid $12.25 per hour, while Llamas was paid $12.50 per hour. QC no longer employs Hearne; Robinson discharged her for violating QC's policies.

Richard Hodge, who identifies himself as Caucasian, became the branch manager of Store 523 in July 2011. His starting wage, as a branch manager, was $12.00 per hour. When Llamas was promoted to branch manager, she was paid $12.00 per hour.

Sara Woerner, who identifies herself as Caucasian, began working for QC in 2007, and voluntarily resigned in 2008. She was rehired by QC in 2009, and promoted to the position of branch manager in 2012. Her starting salary as a branch manager was $12.00 per hour.

Amy Beyers, who identifies herself as Caucasian, was promoted to branch manager in 2008, and paid approximately $12.00 per hour.

According to QC's records, of the thirty-eight individuals Robinson hired during her tenure as area manager, fifteen of the employees identify themselves as minorities. From January 2010 through August 2013, QC discharged at least eight employees who identify themselves as Caucasian for being insubordinate, unprofessional, or using inappropriate language.

Llamas admitted there was no other evidence supporting her race claim. Banker has testified that Llamas's race had nothing to do with his decision to discharge her. Robinson

has testified that race had nothing to do with the performance assessment or write-up she gave Llamas in April 2011.

Asked during her deposition why she believed QC retaliated against her, Llamas testified

> Deanna [Robinson] thought that I was going to bow down to her. She felt like I went behind her back talking to Bill about an account and I did right in front of her face. And, then, she got mad because I called Bill and she didn't want me there no more. It's like you had to do what she says. You had to be her puppet or you weren't going to be there no more.

When Llamas called Banker and talked with him about her merit increase for 2011, she did not mention or intimate that she was being discriminated against on the basis of her pregnancy, race, or for using FMLA leave. She admitted that that the only reference to pregnancy in her May 24, 2011 fax was the comment that "review wasn't based on the year as a whole." There is nothing in her comment indicating that she was discriminated against on the basis of her race.

Banker never talked with Llamas about adding a comment to her performance assessment, and never spoke with Robinson about Llamas's comment about her performance assessment. Llamas never complained to Banker about discrimination or retaliation, and never complained to Robinson about discrimination or retaliation.

Prior to this lawsuit, Banker had never even seen Llamas's May 24, 2011 fax. It is uncontroverted that, at the time of the discharge, Banker was unaware that Llamas had made a comment pertaining to her 2011 performance assessment.

Llamas has testified that her claim of sex discrimination pertains to events that occurred after she returned to work from her FMLA leave. She also admitted during her deposition that before the end of her pregnancy, Robinson and Banker counseled her about punctuality, teamwork, and professionalism.

On November 3, 2010, Robinson gave Joshua Smith, a Caucasian male, who was an assistant manager, a write-up for oversleeping and causing the branch to open late.

In interrogatories propounded to Llamas, she was asked to discuss and describe, among other things, the "male employees" who were treated more favorably than she was treated, and Llamas answered by referring to her answer to Interrogatory 15, which is set froth above. The only male identified in that answer was "Rick, the employee hired to replace Llamas…."

QC hired Hodge in July 2011, after Llamas was discharged. Hodge was hired as a branch manager at the same rate of pay that Llamas was initially paid as a branch manager: $12.00 per hour.

Since she became an area manager, Robinson has hired ten branch managers, of which nine are female. In fact, of the 38 persons Robinson hired during her tenure as area manager, all but five of them were female.

From January 2010 through August 2013, QC has discharged at least two male employees for being insubordinate, unprofessional, and/or using inappropriate language.

Llamas admitted she was not denied any benefits as a result of her pregnancy. She also admitted that Robinson did not tell Llamas or intimate that her pregnancy had anything to do with her termination.

Banker has testified that Llamas's gender or pregnancy had nothing to do with Banker's decision to discharge her. Similarly, Robinson has testified that Llamas's gender had nothing to do the performance assessment or counseling form she gave Llamas in April 2011.

Llamas admitted in her deposition that she had no documentation supporting her claim that QC disciplined her for using FMLA leave. In her answers to interrogatories, Llamas stated, under oath, that

Deanna is a liar…. She wanted me gone before I went on FMLA then gave me a bad review for no reason. I had not had any kind of write up or anything.

When asked in an interrogatory to specify the facts supporting her claim of FMLA retaliation, Llamas responded by stating, under oath, that "Sara in Junction City, who is white, had a baby and then came back to work. As far as I know she is still working for Quik Cash."

Llamas admitted she was allowed to come back to work after her FMLA leave.

Sara Woerner took leaves of absence for her pregnancies in 2008 and again in 2011. Woerner's overall ratings on her performance reviews for 2011 and 2012 were "consistently meets" performance expectations, and there is no record of Woerner receiving any disciplinary write-ups during her employment with QC.

Banker and Robinson both testified that FMLA leave had nothing to do with their decisions regarding Llamas.

In her response to the motion for summary judgment, Llamas identifies three women who were supposedly treated adversely following their taking of maternity leave: Debra Hearne Robinson, Terra Cole, and Breanne Nelson. However, the evidence fails to establish that Hearne Robinson actually took any maternity leave. Further, as noted earlier, QC terminated Hearne for violating company policies, and there is no evidence to the contrary.

As indicated earlier, the plaintiff was generally asked to identify the grounds for her retaliation claim in her deposition, and specifically asked to list the similarly-situated employees in interrogatories. The plaintiff never mentioned either Cole or Nelson. There is no evidence that either Cole or Nelson is in fact similarly-situated to the plaintiff as their job responsibilities, their performance, or the circumstances of the leave.

When Llamas signed her employment application, she certifying that the application was true, accurate, and complete, and agreeing that any misrepresentation or omission of fact would be cause for denial of employment or immediate termination of employment, regardless of when or how discovered. She admitted in her deposition that she was not always truthful on her application.

Llamas admitted that she failed to include all of the requested information on her application to QC. It is uncontroverted that falsifying one's employment application is a violation of QC's disciplinary procedures. QC has routinely and consistently discharged employees or disqualified applicants from employment for falsifying their employment applications and/or omitting information requested on their applications. Had QC learned during her employment that she had falsified her application and made material omissions, the company would have discharged Llamas. From July 2006 through August 2013, QC has discharged or disqualified more than 300 individuals who have falsified their employment applications and/or made omissions on their employment applications.

### Conclusions of Law

QC first argues in its summary judgment motion that Llamas has failed to establish a prima facie case of FMLA retaliation, because she has failed to show that either her counseling (in April, 2011) or her termination (in May) were related to her taking of FMLA *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208-09 (10th Cir. 2003). QC argues that the counseling was not an adverse employment action which affected the conditions of her employment. In her response, Llamas does not respond to the motion as to the April counseling, and accordingly the plaintiff's claim that she suffered retaliation when she was discharged in May following Youngblood's audit.

The court finds that Llamas has failed to present a prima facie case of FMLA retaliation because the termination occurred 100 days after the date she first took FMLA

leave on February 14, 2011, and some 44 days after the FMLA leave ended. Inference of causation arises only when an adverse employment action follows "very closely" upon the protected conduct. *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999). Nor has Llamas shown by admissible evidence that QC employed a pattern of retaliation against workers taking FMLA leave. Similarly, the evidence fails to show that Llamas was subjected to heightened scrutiny following her FMLA leave. To the contrary, the evidence indicates that Llamas was counseled for a lack of professional conduct, tardiness, and personal conflicts both before and after her FMLA leave. Llamas has in fact admitted the existence of this counseling. The evidence as a whole fails to suggest any causal relationship between the FMLA leave on the one hand, and either the termination, or the personnel issues leading up to that termination, on the other.

Even if Llamas had demonstrated the existence of a prima face claim, summary judgment would be appropriate because QC had a legitimate, non-discriminatory reason for discharging Llamas, naming, the marked decline in the store's performance as reflected in the audit score, continuing issues relating to Llamas's lack of professionalism, Youngblood's report that Llamas was using profane language in front of customers and other employees, and, most particularly, acts of insubordination by Llamas. The evidence is uncontroverted that reports of this conduct was made to Banker, the company decision-maker, and that the reports documented the existence of serious employee misconduct. The plaintiff concedes that the misconduct cited by QC would indeed be serious violations of QC's policies. *See Ray v. Safeway Stores, Inc.*, 614 F.2d 729, 731 (10th Cir. 1980) (finding insubordination may be legitimate grounds for termination).

However, Llamas argues that QC's concerns were actually a pretext for retaliation, arguing alternatively that she did not in fact use such language, or, if she did, it was not "offensive" because the persons on the scene were not actually offended. She also argues

that pretext is established by the failure of QC to follow a supposed progressive discipline policy.

However, Llamas has failed to show that QC's stated rationale for its action is "so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover*, 382 F.3d 1064, 1071 (10th Cir. 2004). The uncontroverted evidence does not support a finding that QC acted pretextually in discharging Llamas. Rather, the evidence establishes that Banker learned through two different sources (Robinson and Youngblood) that Llamas had employed offensive language and appeared to be acting unprofessionally and contrary to QC policies. Whether or not Llamas actually used specific language, or whether she used certain language but the listeners were not "offended," the fact remains that Banker had multiple reports of serious misconduct by Llamas. Although he was not inclined to discharge Llamas solely on the basis of the audit, Banker's conversations with Robinson and Youngblood led him to belief that discharge was the appropriate solution. QC had a good faith basis for its belief that Llamas had engaged in repeated and serious misconduct, and nothing in the evidence shows that assessment was pretextual.

Similarly, Llamas's progressive discipline policy argument is unfounded in the evidence. The evidence before the court shows only that QC generally prefers to employ a program of progressive discipline. Nothing in the evidence supports any claim that QC inflexibly follows such a policy, regardless of the gravity of the offense, or where the misconduct takes repeated and compound forms. To the contrary, the evidence establishes that QC retains the power to immediately discharge employees in certain cases. Further, it is simply untrue that plaintiff's termination in May of 2011 was some bolt from the blue. Llamas had in fact been counseled previously about her conduct.

Llamas has not identified any similarly-situated employees who escaped discharge even though they used similarly offensive language and engaged in similar unprofessional conduct. The only individual identified by plaintiff in her deposition as similarly situated,

a Sara in Junction City, was in fact treated similarly to the plaintiff in that both were returned to their employment after their FMLA leave. QC had documented and long-standing issues with Llamas's performance well before the FMLA leave, and the court finds that summary judgment is properly granted as to plaintiff's FMLA retaliation claim.

The plaintiff's claim for retaliation under Title VII is similarly lacking in support. First, there is no evidence that Llamas engaged in any protected activity under Title VII. Llamas argues that she did so when she complained in her May 24 fax that her earlier performance assessment "wasn't based on the year as a whole." She argues that this should be viewed as a complaint that the assessment included time during which she was pregnant.

But this portion of the Llamas's narrative comment makes no reference to any discrimination. Indeed, the comment proceeds to acknowledge that "I did not do my best due to how I felt" towards the end of her pregnancy, and that she did "not believe that being pregnant is an excuse not to perform to the duties of my job title." Llamas was specifically asked about the faxed comment in her deposition, and she agreed that the comment did not indicate retaliation. Nothing in the May 24, 2011 comment, or any other communication sent by Llamas, would alert an ordinary reader to suppose that Llamas was complaining of discrimination. Such vague comments simply do not amount to activity protected by the statute. *See Anderson v. Acad. Sch. Dist. 20*, 122 Fed. Appx. 912, 916 (10th Cir. 2004).

And again, even assuming that Llamas had engaged in protected activity, she has failed to show a causal connection with her termination. Here, the uncontroverted evidence is that Banker decided to terminate Llamas, and proceeded to do so, without any knowledge of her faxed comment. Banker learned of the comment only in the consequence of the present litigation. And even further assuming that Banker had been aware of protected activity by Llamas, summary judgment remains appropriate, because, as

explained above, QC had a legitimate rationale for its action and the plaintiff has failed to show that rationale was a pretext for unlawful conduct.

Llamas claims that QC engaged in pregnancy and sex discrimination. QC seeks summary judgment as to the these claims, arguing the plaintiff has failed to present a prima facie case of discrimination as to the pay rate Llamas received, the April counseling given to her, the 2011 performance assessment, or her termination at the end of May. As with the FMLA retaliation claim, the plaintiff's response addresses the termination alone. Accordingly, the court grants summary as to plaintiff's pregnancy discrimination claim based upon rate of pay, the April 2011 counseling, and the April 2011 performance assessment.

The court finds that plaintiff's remaining claim is also subject to summary judgment. Llamas was not pregnant at the time she was discharged, and indeed had not been pregnant for nearly three months. Thus, she is not in the protected class for such claims. *See Brinkman v. State Dep't of Corrs.*, 863 F. Supp. 1479, 1485 (D. Kan. 1994).

Even assuming Llamas did fall within such a protected class, summary judgment would be appropriate because the evidence does not show that QC treated similarly situated employees different. In this context, "[s]imilarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Timmerman v. U.S. Bank*, 483 F.3d 1106, 1120 (10th Cir. 2007).

Here, the uncontroverted evidence only identifies two QC employees (Sara Woerner and Debra Hearne Robinson) under supervision by plaintiff's supervisor Deanne Robinson. The evidence fails to show that these employees were similarly situated.

Sara Woerner did not become a branch manager until 2012, a year after plaintiff's termination. She took maternity leave in 2011 and later returned to the company. But the evidence establishes that, unlike Llamas, Woerner received consistently good assessments

and was never disciplined while employed by QC. There is no evidence that Woerner ever used, or was reported to QC for using, foul or offensive language or engaging in insubordinate or unprofessional behavior. Debra Hearne Robinson did not work for QC until eight months after plaintiff's termination. Robinson was terminated for violating company policies. Thus, the plaintiff has failed to document the existence of similarly situated employees, outside the protected class, who were treated more favorably than herself.

Finally, QC moves for summary judgment on Llamas's race discrimination claims, and argues that if the court otherwise finds any prima facie case of discrimination or retaliation, it should still grant summary judgment given its post-termination acquisition of evidence indicating that Llamas was not truthful in her job application. Llamas does not seek to defend her claim of race discrimination in her response. Accordingly, the defendant's former argument is granted as uncontested, its latter is denied as moot in light of the other findings by the court.

IT IS ACCORDINGLY ORDERED this 24th day of February, 2014, that the defendant's Motion to Strike (Dkt. #52) is denied; the Motion for Summary Judgment (Dkt. 45) is granted.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE